**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KEVIN B. DUFF, RECEIVER FOR THE ESTATE OF EQUITYBUILD INC. AND EQUITYBUILD FINANCE LLC, etc., <br><br> Plaintiff, <br><br> v. <br><br> TYLER W. DEROO, RONALD JOHN BOL, TRINITY INSPECTION & RESTORATION, INC., <br><br> Defendants. | Civil Action No. 22-cv-04336 <br><br> Jury Trial Demanded |

## COMPLAINT

Kevin B. Duff, as court-appointed receiver ("Receiver"), in the case captioned *SEC v. EquityBuild, Inc., et al.,* Civil Action No. 18-cv-5587 (the "SEC Action"), United States District Court for the Northern District of Illinois, Eastern Division (the "Illinois District Court"), for EquityBuild, Inc. ("EquityBuild"), EquityBuild Finance, LLC ("EquityBuild Finance"), their affiliates, and the affiliate entities of Jerome ("Jerry") Cohen and Shaun Cohen, which affiliates are identified in that certain Order Appointing Receiver entered August 17, 2018 (SEC Action, ECF No. 16), as supplemented by that certain Order entered March 14, 2019 (SEC Action, ECF No. 290), and that certain Order entered February 21, 2020 (SEC Action, ECF No. 634), pursuant to the powers vested in him by Order of the Court in the SEC Action, complains against Tyler DeRoo, Ronald John Bol, and Trinity Inspection & Restoration, Inc. ("Trinity") as follows:

### INTRODUCTION AND PROCEDURAL HISTORY

1.     On August 15, 2018, the U.S. Securities and Exchange Commission (the "SEC") filed a complaint against EquityBuild, EquityBuild Finance, and Jerome Cohen and Shaun Cohen,

in the matter of *Securities and Exchange Commission v. EquityBuild, Inc.*, *et al.*, Case No. 18-cv-05587 (the "SEC Action"), which is pending in the Illinois District Court.

2.      The Complaint filed in the SEC Action alleged that Jerome and Shaun Cohen (collectively, the "Cohens") violated securities laws, breached their fiduciary duties to EquityBuild's investors, and operated EquityBuild as a fraudulent scheme and Ponzi scheme.  *A true and correct copy of the Complaint filed in the SEC Action is attached hereto as* **Exhibit "1"**.

3.      The fraudulent scheme largely involved enticing foreign and domestic investors — based on false or misleading statements or omissions of material facts — to purchase real estate properties, to purchase partnership or membership interests in entities that purchased real estate properties, to extend loans to individuals or entities for the purpose of acquiring or refinancing real estate property (including to EquityBuild and its affiliates), or to participate in the making of loans to individuals or entities for these purposes.  Most of the real estate promoted to investors consisted of distressed residential properties on the south side of Chicago.

4.      On August 17, 2018, this Court entered an Order Appointing Receiver (the "Receivership Order") [ECF No. 16] in the SEC Action.  Pursuant to the Receivership Order, the Receiver is authorized to "bring such legal actions based on law or equity . . . as the Receiver deems necessary or appropriate in discharging his duties as Receiver."  SEC Action, Receivership Order at ¶8.M.  Further, the Receiver is authorized "to pursue . . . all suits, actions, claims and demands which may now be brought by . . . the Receivership Estate" or "as may be approved by this Court."  *Id.* at ¶8.N−O.  Included in such actions are claims for aiding and abetting fraud and breach of fiduciary duties, as well as unjust enrichment actions to recover or "claw-back" monies wrongfully paid by EquityBuild.  *See id.* at ¶43.

5.     Notably, with respect to ancillary claims such as the Receiver's claims against the Defendants here, the Receivership Order provides that:

> All Ancillary Proceedings are stayed in their entirety, and all Courts having jurisdiction thereof are enjoined from taking or permitting any action until further Order of this Court.  Further, as to a cause of action accrued or accruing in favor of one or more of the Receivership Defendants against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action.

*Id.* at ¶34.

6.     The financial records of EquityBuild, including its accounting records and various statements, cancelled checks, deposit slips and wire transfer confirmations from financial institutions confirm the SEC's allegations that funds solicited from new investors were used to pay existing investors.

7.     Moreover, the Receiver's investigation revealed that Defendants DeRoo and Bol, individually and through Trinity, played integral roles in the perpetuation of the EquityBuild Ponzi scheme by, among other things: (1) assisting the Cohens in the development and dissemination of marketing materials, offering memoranda and private placement memoranda that contained knowingly false or misleading statements of fact (or omissions of fact) (2) creating and "seasoning" fake online user profiles to deceive prospective investors about the safety and security of the investments; and (3) making false or misleading statements of fact (or omitting to disclose material facts) to the SEC and to prospective private and institutional lenders.

8.     In short, EquityBuild's business was a Ponzi scheme orchestrated by the Cohens and facilitated by the Defendants who built a "house of cards" around the Ponzi scheme to continuously deceive new and existing investors, including private and institutional lenders and

even the SEC.  Ultimately, during the time Defendants worked with EquityBuild, the investors lost dozens of millions of dollars.

## THE PARTIES

### The Receiver

9.      Plaintiff Kevin B. Duff is the court-appointed Receiver and brings this action pursuant to the authority granted him in the SEC Action.

### The Defendants

10.      Defendant DeRoo was an EquityBuild employee who initially worked primarily in an underwriting capacity.  DeRoo's roles with EquityBuild later expanded to include asset management and overseeing the refinancing of the investor-lender debt.  At all times material hereto, Defendant DeRoo received substantial amounts of funds from EquityBuild purportedly in exchange for underwriting and asset management services that did not provide value to EquityBuild.

11.      Defendant Trinity is an Illinois licensed inspection company (https://trinityinspectiongroup.com/about/).  At all relevant times, Defendant Bol was the sole owner and President of Defendant Trinity.  Defendant Trinity received substantial amounts of funds from EquityBuild purportedly in exchange for services including conducting inspections on and preparing inspection reports regarding prospective Equity Build acquisitions that did not provide value to EquityBuild.

12.      Defendant Bol served and considered himself as Chief Operating Officer (the "COO") of EquityBuild.  At all times material hereto, Defendant Bol received substantial amounts of funds from EquityBuild purportedly in exchange for services he provided through Trinity and individually as EquityBuild's COO that did not provide value to EquityBuild.

## JURISDICTION & VENUE

13.     This Complaint is brought to accomplish the ends sought and directed by the Illinois District Court in the SEC Action and relates to the claims in the SEC Action, over which this Court has original jurisdiction pursuant to Title 28, United States Code, Section 1331, because this action forms "part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).   Thus, this Court has supplemental jurisdiction over the claims set forth herein.

14.     This Court has personal jurisdiction over Defendants because Defendants are either residents of Illinois or are business entities formed in Illinois.   Specifically:

      a.   Defendant Tyler DeRoo resides at 635 West Briar Place, Unit 4, Chicago, IL 60657 and transacts business in Cook County, Illinois.

      b.   Defendant Ronald Bol resides at 28049 South Kedzie Avenue, Monee, IL 60449-8586 and transacts business in Will County, Illinois.

      c.   Defendant Trinity is an Illinois corporation with its principal place of business at 28049 South Kedzie Avenue, Monee, IL 60449-8586 in Will County, Illinois.

15.     This Court also has personal jurisdiction over Defendants because they conducted business with EquityBuild, which in turn was conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Eastern District of Illinois.   Further, the payments that Defendants received from EquityBuild were proceeds from EquityBuild's fraudulent scheme conducted, in large part, in the Eastern District of Illinois.

16.     Venue is proper in this District, pursuant to Title 28, United States Code, Sections 754, 1391(b), and 1692, because this action is brought to accomplish the objectives of the Temporary Restraining Order and the Receivership Order in the SEC Action and is thus ancillary to the Court's exclusive jurisdiction over the Receivership Estate.

## FACTUAL ALLEGATIONS

17.     Jerome ("Jerry") Cohen and Shaun Cohen (collectively, the "Cohens"), through EquityBuild and EquityBuild Finance and with the assistance of Defendants, raised at least $135 million from nearly 900 investors by falsely promoting "safe" investments, either equity interests in, or the making of ostensibly secured loans recorded against, income-producing real estate that would generate superior risk-adjusted, double-digit returns.

18.     Generally, EquityBuild (operated by Jerry Cohen) would acquire the properties, while EquityBuild Finance (managed by Shaun Cohen) would solicit investors across the country (and beyond) to pool their funds and participate in short-term, interest-only group loans to EquityBuild (or an EquityBuild affiliate) for the stated purpose of financing the acquisition, improvement, stabilization, and refinancing or sale of these properties. EquityBuild Finance also falsely promised these "investor-lenders" (as they are described in the SEC Action) that their loans would be secured by a first position mortgage recorded against the particular property in connection with which they invested.

19.     As EquityBuild consistently failed to satisfy the typically unrealistic valuation projections in the misleading and deceptive offering memoranda prepared largely by Defendant DeRoo, it was unable to repay the principal balances of the group loans at maturity. And because EquityBuild Finance, as originator, syndicator and servicer of the loans, always advanced EquityBuild far more than its total invested cost in any particular property, EquityBuild retained no capital in any of its real estate assets, and the investor-lenders bore the entirety of the default risk.

20.     EquityBuild, in classic Ponzi-like fashion, funded monthly interest payments to existing investor-lenders using commingled, fresh funds solicited from new investor-lenders.

6

21.     When the short-term loans matured, however, Equity Build could not repay the principal and therefore employed a variety of tactics to keep the investor lenders at bay, including for some investors converting their debt to equity and releasing their mortgages without their knowledge or consent in order to secure new funds from refinancing private and institutional lenders.

22.     Over time, however, the debt to the investor-lenders only increased, and the general and administrative overhead expenses required to pay the EquityBuild principals, the sales agents, the IT consultants, the accountants, the lawyers, and the public relations team (and many others) escalated substantially.  As such, EquityBuild could no longer raise new capital quickly enough from new investors to meet the significant operating expense shortfall that remained following the receipt and application of the net operating income generated by the properties in its portfolio.

***DeRoo And Bol Recognize
That EquityBuild Is At Least
$12 Million "Under Water."***

23.     Defendants knew that EquityBuild was consistently unable to repay the investor-lenders' principal at maturity, whether by sale or through refinancing, without an infusion of additional cash.

24.     For example, a spreadsheet prepared by Bol and e-mailed to DeRoo on November 16, 2016 (hereinafter, the "November 2016 Spreadsheet") analyzed 37 properties acquired by EquityBuild and revealed that EquityBuild would be obligated to repay $54,605,000 in principal over the ensuing 18 months, although the total fair market value of the properties securing that debt (as estimated by Bol and DeRoo) equaled only $42,110,000.

25.     In an effort to obtain new investor funds and keep the Ponzi scheme going, Defendants Bol and DeRoo assisted in the preparation of marketing flyers that contained the following misrepresentations, among many other false statements of fact:

a. "Through more than 700 successful real estate transactions, EquityBuild has a solid track record of structuring deals to generate positive free cash flow after mortgage and all operating expenses have been paid."

b. "EquityBuild's proprietary econometric model identifies markets with properties that have low purchase prices combined with high potential rents, at a sufficient volume to deliver economies of scale."

c. "EquityBuild's rigorous three-stage underwriting process ensures we discover faults and vulnerabilities in major building systems before a purchase is completed, and that we never overpay."

d. "EquityBuild properties deliver strong, positive cash flow while locking in resale value."

e. "EquityBuild has forged strong relationships with city officials and decision makers, allowing us to produce results others cannot."

26. The marketing flyers touted EquityBuild's "recent success stories" by highlighting its experience with six selected properties, but omitted to disclose that the overwhelming majority of the properties in its portfolio were "under water" and that the outstanding principal balances of the investor-lender debt routinely exceeded the value of the corresponding properties.

27. DeRoo proposed a plan to avert the imminent stream of defaults by refinancing the properties without the knowledge or consent of some investors, and converting their debt to equity. EquityBuild implemented the plan and DeRoo played the primary role in its execution. The plan, devised by DeRoo and carried out with assistance from Bol, inflicted millions of dollars in damage to the EquityBuild estate.

***DeRoo And Bol Were Fully
Aware Of Claims Of
<u>Wrongdoing By EquityBuild.</u>***

28. Prior to creation of the November 2016 Spreadsheet, DeRoo and Bol were fully aware of claims of wrongdoing by EquityBuild.

8

29.     For example, on or about September 1, 2015, DeRoo received an e-mail forwarded by Jerry Cohen in which an investor who purchased a property from EquityBuild with financing arranged through EquityBuild Finance complained that the company sold him a "failed investment" and demanded that the property be repurchased from him.  The investor complained that EquityBuild misrepresented the length of time required to rehabilitate the property (three years had now elapsed, although EquityBuild indicated that only one year would be required), tenant rents had been understated, real estate taxes had been understated, and EquityBuild had been sitting on the $200,000 he had paid to rehabilitate the property yet not performed any of the work, as a result of which the building remained vacant.

30.     On or about January 27, 2016, Bol received an e-mail from a different investor who purchased an apartment building from EquityBuild and was complaining, among other things, of poor project management, poor communication, poor management of funds, failure by EquityBuild to deliver on promises, misrepresentations by EquityBuild in its periodic reporting, and failure by EquityBuild to pay more than $90,000 in long past due interest owed to him in connection with two other projects.

31.     On or about May 17, 2016, the daughter of a former EquityBuild attorney who abruptly withdrew from the engagement, posted a comment in a discussion thread that appeared on *BiggerPockets.com*, a nationwide forum for real estate investors.  The comment read as follows:

> DO NOT INVEST WITH EQUITYBUILD!!!!! My father was their attorney for several years, and ultimately took his life over their illegal and unethical business practices. I have attached his suicide note here which details the Ponzi scheme: "Shaun is using investor money to buy and rehab properties owned by his father Jerry. Crazy mortgages are put on the property and EquityBuild abandons them." In another note, he said that Jerry Cohen and his nephew Scott Cohen were convicted of a major rental fraud scheme in Philadelphia in 1999.
>
> If you look at the Cook County Recorder of Deeds website, EquityBuild is the Grantor/Grantee on 190/160 properties respectively in the Chicagoland area. They

are the defendant in numerous housing court cases in Chicago as well. . . . Your money is not safe with EquityBuild[.]

32.     On October 24, 2016, Bol was forwarded an anonymous e-mail questioning: (1) whether EquityBuild had ever repaid the principal balance due on any loan at maturity, as opposed to inducing the investor-lenders to roll their proceeds into another promissory note; and (2) how many properties EquityBuild had ever improved with funds allegedly allocated for that purpose. The referenced e-mail posed the following rhetorical questions:

> Are you going to enjoy spending a few years of your life behind bars being someone's girlfriend? Do you sleep well at night? You do know that there are investors out there that probably wouldn't think twice about finding you if their funds are lost? * * * Do you know what a Ponzi scheme is? Comments?

33.     In February 2017, *Ripoff Report.com* ("*Ripoff Report*"), an online forum for discussing "frauds" and "scams," forwarded Bol an e-mail from the purchaser of an EquityBuild property who found a thread entitled "EquityBuild Inc. Jerry Cohen these guys sell you junks and rip you off every penny" and noticed the comments of an alleged victim who told a story that matched her own recent experience.  The investor alleged that EquityBuild sold her an apartment building that was "fully renovated," but that the City of Chicago cited the property for building code violations within two months after she purchased it, requiring her to spend approximately $84,000 replacing 46 failing lintels.

34.     Defendant Bol responded to *Ripoff Report* on February 23, 2017, falsely indicating, among other things, that: (1) he twice called the investor and left a voice-mail in an effort to address her concerns (a fact she vigorously disputed and offered to disprove); (2) "we pride ourselves in fulfilling our obligations to our clients;" and (3) the problem was actually caused by the investor's "decision to disconnect" from EquityBuild and its "fulfillment chain of experts."

35.     On September 12, 2017, Jessica Baier, who had worked for EquityBuild for nearly ten years, composed an e-mail complaining about the cancellation of her cell phone service

following her resignation from the company and copied Bol.  In the referenced e-mail, Ms. Baier

wrote as follows:

> I have an $1800 debt to the IRS because of equity build. And if the rest of my
> severance doesn't come in as discussed with Jerry I will be hiring an attorney and
> I will let everything that I know about this company out, do not try me. Ron I see
> you're copied so I know you're getting all of this and you know exactly what I'm
> talking about. And if you don't know what I'm talking about you might want to
> inquire as to the type of man that you're working for. You think after 10 years I
> wanted to quit and leave this company, no but my morals would not allow me to
> work for this company anymore.

36.     To combat the adverse effects that the growing increase in negative online reviews

were having on the ability of EquityBuild Finance to raise new capital, Bol and DeRoo actively

assisted in the development and implementation of a plan to create fake user profiles and to

"season" those profiles in order to post ostensibly credible, but patently false, reports of favorable

investment experiences with EquityBuild.

**The Ponzi Scheme**
**Comes to A Head.**

37.     On October 10, 2017, Bol became aware that EquityBuild received a document

subpoena from the SEC (the "SEC Subpoena") that requested, among other things, a list of every

bank account and copies of all bank statements, copies of all financial statements, copies of all

communications with accountants, a list of all investors, the amounts they invested, how much of

their principal had been returned, and, if not returned, why it was not returned and what

EquityBuild was doing about it.

38.     On January 17, 2018, Bol received an e-mail from Shaun Cohen referencing the

SEC Subpoena and indicating that: (1) the United States Securities & Exchange Commission had

issued another subpoena requesting his testimony, as well as the testimony of DeRoo; (2) the prior

production of documents in response to the SEC Subpoena was "very limited and not even

remotely calculated to capture [all] documents" requested; and (3) substantial additional

documents were being sought, including all underwriting guidelines, all marketing materials, offering memoranda, private placement memoranda, and white papers, the account statements for every investor-lender, and all recorded training videos.

39.     Defendants Bol and DeRoo made false or misleading statements and omitted to provide material information regarding EquityBuild to the SEC.

40.     On March 7, 2018, Bol received a letter addressed to EquityBuild's outside counsel in which an attorney for Michigan Shore Apartments, LLC ("Michigan Shore") stated that "[o]ur focused research and analysis, related to not only this transaction but other substantially related parties and methodologies, has led us to conclusions that would be disturbing to any reasonable person similarly cognizant of this information."

41.     The attorney for Michigan Shore demanded, among other things, the return of the approximately $500,000 his client had invested in the property "based upon a deceptive, improper, and commercially inappropriate planning and structuring" by EquityBuild.  The attorney for Michigan Shore also forwarded an August 23, 2016 letter sent to Jerry Cohen alleging that EquityBuild promised to complete the improvements to the building by October 27, 2015, but that the work did not begin until at least another 150 days thereafter and was then begun without building permits, as a result of which the City inspectors began treating the building with "increased scrutiny, such that even the smallest infraction [became] a major problem."

42.     On March 20, 2018, Michigan Shore filed a 13-count complaint against EquityBuild, EquityBuild Finance, the Cohens, and Mark Brosius alleging, among other things, fraud and breach of fiduciary duty, and Bol received a copy of the lawsuit the following day.

43.     Just a few months later, on August 15, 2018, the SEC filed its complaint in the SEC Action against the EquityBuild entities and the Cohens.

12

***Defendants are Unjustly Enriched***
***by Payments from EquityBuild.***

44.     From June 16, 2015 to September 14, 2018, EquityBuild made payments to Defendant DeRoo totaling approximately $212,996.62.  Additionally, and through his role as broker for Kale Realty, DeRoo received approximately $953,507.00 in commission payments between October 22, 2015 and May 8, 2018, in connection with the purchase of real estate by EquityBuild and its affiliates.

45.     From January 9, 2014 to August 16, 2018, EquityBuild made payments to Defendant Trinity totaling approximately $1,214,948.06.  Upon information and belief, Trinity transferred the funds it received from EquityBuild to Defendant Bol as its sole owner, making Bol the ultimate recipient of these funds.

46.     Collectively, EquityBuild's payments to Defendants are hereinafter referred to as the "Payments".

47.     Defendants received the Payments without providing reasonably equivalent value to EquityBuild in exchange for those Payments.

48.     Further, any services that Defendants may have provided to EquityBuild only facilitated and perpetuated the fraud against the investor-lenders, equity investors, and fund investors.  Thus, not only did Defendants not provide any reasonably equivalent value or any other benefit to EquityBuild, but also Defendants increased the damages suffered by EquityBuild by increasing the amounts owed to investors and creditors which will be reflected in any restitution that EquityBuild, EquityBuild Finance, and their affiliate entities will be required to pay.

49.     Moreover, at all material times, Defendants DeRoo and Bol received the Payments from EquityBuild as insiders of EquityBuild who knew or should have known that EquityBuild was being operated as a Ponzi scheme and/or that EquityBuild was making fraudulent

misrepresentations to its investors regarding the use of their funds and, thus, Defendants did not receive the Payments in good faith.

50.     When EquityBuild made the Payments to Defendants, EquityBuild intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay them as they became due.

51.     Thus, EquityBuild had the actual intent to delay, hinder, or defraud investors and creditors, and made the Payments to delay, hinder, or defraud investors and creditors.

52.     EquityBuild, and thereby the Receivership Estate, have been damaged significantly as a direct and proximate result of the Payments as alleged above.  Such damages include, but are not limited to, losses due to the dissipation of investor funds for which no reasonably equivalent value was provided and other and further compensatory and consequential damages.

53.     Accordingly, the Receiver brings the instant action, in part, to collect monies that were improperly paid, transferred, dissipated, misappropriated, or lost from EquityBuild as a result of the Payments to, and unjust enrichment of, Defendants.

54.     All conditions precedent to the bringing of this action have been performed or satisfied or have occurred.

## COUNT I
### Unjust Enrichment
### (as to all Defendants)

55.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

56.     EquityBuild conferred a benefit on Defendants when it made the Payments to them in the amount of at least $2,381,451.68, all of which were derived from the fraudulent scheme orchestrated by the Cohens through EquityBuild.

57.     Defendants had knowledge of the benefit Defendants received from EquityBuild as a result of the Payments and voluntarily accepted and retained the benefit conferred.

58.     It is inherently unfair and inequitable violating fundamental principles of justice, equity and good conscience that the funds of investors defrauded in EquityBuild's fraudulent scheme are retained by and used to personally benefit Defendants (who knew or should have known of EquityBuild's fraudulent scheme as insiders of EquityBuild), rather than being returned to the Receivership Estate for the benefit of all of the defrauded investors and creditors.

59.     As a direct and proximate result of Defendants' retention of at least the $2,381,451.68 that EquityBuild paid to Defendants, the Receivership Estate has been damaged or diminished, and, under the circumstances, equity dictates that Defendants should return the funds received from EquityBuild and turn over any assets they may have acquired with those funds to the Receiver for the benefit of all of the defrauded investors and creditors.

WHEREFORE, Plaintiff, as the Receiver for EquityBuild, respectfully requests that the Court enter judgment against Defendants: (1) entering a money judgment against Defendants, in the full amount of the Payments received by each Defendant, and, if necessary, imposing a constructive trust and/or equitable lien on the funds or other assets traceable to such Payments; (2) finding Bol jointly and severally liable for the return of the Payments that EquityBuild made to Defendant Trinity; (3) awarding Plaintiff damages, costs, and interest; and (4) granting such other and further relief as may be just and proper.

### COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### (against Defendant Tyler DeRoo)

60.     Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

61.     As set forth above, the Cohens were operating EquityBuild as a fraudulent scheme and as a Ponzi scheme to the detriment of EquityBuild and its investors and/or creditors, as determined by the Court in the SEC Action.

62.     By defrauding EquityBuild's investors and operating a Ponzi scheme, the Cohens breached their fiduciary duty to EquityBuild's investors to safeguard their investments and not use their investment funds for Defendants' own personal benefit.

63.     In DeRoo's various roles with EquityBuild, DeRoo actively and substantially assisted EquityBuild in defrauding hundreds of investor-lenders, many of whom lost their life savings.

64.     DeRoo was the prime architect of a plan to refinance investor-lender loans and convert the investor-lenders' debt to equity by causing their mortgages to be released without their knowledge or authorization.

65.     DeRoo was fully aware that investor-lenders were induced to make loans to EquityBuild based on the false representation that those loans would be secured by first-position mortgages.

66.     DeRoo requested the preparation of, and then submitted, knowingly false mortgage payoff statements in order to effectuate the refinancing of investor-lender debt and, as a consequence, inflicted tens of millions of dollars in additional losses to the victims of the Ponzi scheme.

67.     DeRoo helped perpetuate the Ponzi scheme by supplying false information to private and institutional lenders in order to secure refinancing loans and by lying to the SEC during his deposition.

68.     At all relevant times, DeRoo knew that EquityBuild was a Ponzi scheme.

16

69. Through his roles with EquityBuild, DeRoo knowingly and substantially assisted the Cohens in perpetuating the fraudulent scheme and Ponzi scheme over the course of several years.

70. As a direct and proximate result of DeRoo's conduct, EquityBuild sustained damages.

WHEREFORE, Plaintiff, as the Receiver for EquityBuild, respectfully requests that the Court enter judgment against Defendant DeRoo for compensatory damages and/or restitution, interest, costs, and for such further relief as may be just and proper.

## COUNT III
### Aiding and Abetting Breach of Fiduciary Duty
### (against Defendants Trinity Inspection & Restoration, Inc. and Ronald Bol)

71. Plaintiff repeats and re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 54 of this Complaint as if fully set forth herein.

72. As set forth above, the Cohens were operating EquityBuild as a fraudulent scheme and as a Ponzi scheme to the detriment of EquityBuild and its investors and/or creditors, as determined by the Court in the SEC Action.

73. By defrauding EquityBuild's investors and operating a Ponzi scheme, the Cohens breached their fiduciary duty to EquityBuild's investors to safeguard their investments and not use their investment funds for their own personal benefit.

74. In Bol's role as the sole owner of Trinity, and later, in Bol's role as Chief Operating Officer for EquityBuild, Bol actively and substantially assisted EquityBuild in defrauding hundreds of investor-lenders, equity investors, and fund investors many of whom lost their life savings.

75.     Bol assisted in the planning and implementation of a scheme to refinance millions of dollars in investor-lender debt and to cause the mortgages securing that debt to be released without the knowledge or authorization of the investor-lenders.

76.     Bol was fully aware that investor-lenders were induced to make loans to EquityBuild based on the false representation that those loans would be secured by first-position mortgages.

77.     Bol oversaw a plan to create fake user profiles on BiggerPockets.com and lied in his communications with RipOff Report in order to deceive prospective investor-lenders into believing that EquityBuild was a reputable company.

78.     At all relevant times, Bol knew that EquityBuild was a Ponzi scheme.

79.     All actions of Bol as alleged herein were committed within the scope of his employment with Trinity.

80.     Through his roles with EquityBuild, Bol knowingly and substantially assisted the Cohens in perpetuating the fraudulent scheme and Ponzi scheme over the course of several years.

81.     As a direct and proximate result of Bol's and Trinity's conduct, EquityBuild sustained damages.

WHEREFORE, Plaintiff, as the Receiver for EquityBuild, respectfully requests that the Court enter judgment against Defendants Bol and Trinity for compensatory damages and/or restitution, interest, costs, and for such further relief as may be just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby requests a trial by jury.

Dated:  August 16, 2022                    Respectfully submitted,

/s/ *Michael Rachlis*

Melanie E. Damian
Damian & Valori LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
(305) 371-3960
*mdamian@dvllp.com*

Michael Rachlis
Rachlis Duff & Peel LLC
542 South Dearborn Street, Suite 900
Chicago, IL 60605
(312) 733-3950
*mrachlis@rdaplaw.net*

Andrew Eliot Porter
Porter Law Office
853 North Elston Avenue
Chicago, IL 60642
(312) 433-0568
*andrew@andrewporterlaw.com*

*Attorneys for Plaintiff*

# Exhibit 1

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) | 18-CV-5587 |
| EQUITYBUILD, INC., EQUITYBUILD FINANCE, LLC, JEROME H. COHEN, and SHAUN D. COHEN, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission ("SEC") alleges as follows:

1.      The SEC brings this action to halt an ongoing Ponzi scheme.  Since at least 2010, Defendants Jerome and Shaun Cohen, through their companies, Defendants Equitybuild, Inc. and Equitybuild Finance, LLC, have raised at least $135 million from more than 900 investors. Defendants raised these funds by falsely promising investors safe investments, secured by income-producing real estate, that generated returns of 12% to 20%.  Most of the real estate promoted to investors were residential properties in underdeveloped areas on the South Side of Chicago.

2.      Defendants defrauded their investors in multiple ways.  For instance, Defendants hid from investors that they skimmed 15% to 30% off each investment by taking undisclosed fees.  In many cases they did this by telling investors that the properties being purchased cost substantially more than what Defendants actually paid for them.  This meant that investors were not only overcharged, but the real estate supposedly securing their investments was worth much less than what Defendants told investors.

3. Beyond the exaggerated property valuations and undisclosed fees, Defendants falsely told investors that their impressive returns would be generated by profitable real estate. Contrary to Defendants' claims, Defendants sustained heavy losses and the properties they pitched to investors failed to earn anywhere near enough to pay the promised double-digit returns. As a result, Defendants' investment program devolved into a Ponzi scheme: Defendants could only pay earlier investors by raising funds from unwitting new investors.

4. Rather than disclosing their financial problems, to keep the scheme afloat the Defendants continued to solicit investors with offers of safe investments and outsized returns.

5. Defendants later changed their business model by offering investments in pooled investment funds, again promising double-digit returns generated by income-producing real estate. But Defendants concealed from new investors that most of the properties supposedly being acquired and renovated by new investor proceeds were the very same properties "securing" the investments of earlier investors. Defendants also hid from the new investors that, rather than be deployed to develop real estate, significant amounts of their money would be used to make Ponzi payments to earlier investors.

6. As for the earlier investors, Defendants forced them to restructure their investments by pushing back the timeframes for repayment, swapping investors' supposedly secured investments for new unsecured instruments, and by transferring title of the properties purportedly securing the investments into special purpose entities owned by Defendant Jerome Cohen.

7. On the brink of their scheme collapsing, Defendants recently started coming clean about their financial distress and inability to repay investors through revenue-producing real estate. But Defendants limited these disclosures only to earlier investors whose interest payments Defendants could no longer afford to make. Despite these partial disclosures, Defendants continue

to raise funds from new investors by concealing their dire financial condition while promising

"guaranteed" returns and annual interest payments as high as 17%. This lawsuit seeks to stop

Defendants' scheme.

## JURISDICTION AND VENUE

8.     The SEC brings this action under Securities Act of 1933 ("Securities Act")

Section 20(b) [15 U.S.C. §77t(b)] and Securities Exchange Act of 1934 ("Exchange Act")

Sections 21(d) and (e) [15 U.S.C. §§78u(d) and 78u(e)].

9.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

10.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15

U.S.C. § 78aa]. Many of the acts, practices, and courses of business constituting the violations

alleged herein have occurred within the Northern District of Illinois.

11.     Nearly all of the securities described herein involved real estate investments in

Chicago. Defendants operate an office in Chicago and used investor funds to purchase, renovate,

and develop Chicago residential properties. Defendants also offered and sold the securities

described herein to investors in the Northern District of Illinois.

12.     Defendants directly and indirectly made use of the means and instrumentalities of

interstate commerce and of the mails in connection with the acts, practices, and courses of

business alleged herein, and will continue to do so unless enjoined.

## DEFENDANTS

13.     **Equitybuild, Inc.** is a Florida corporation, with an office in Chicago. Since at least

2010, Equitybuild, Inc. ("Equitybuild") has solicited investments promising returns generated by the

purchase, renovation, and development of real estate in Chicago.

14. **Equitybuild Finance, LLC**, formerly known as Hard Money Company, LLC, is a Delaware limited liability company wholly owned by Equitybuild. Since at least 2010, Equitybuild Finance, LLC ("Equitybuild Finance") has solicited investments promising returns generated by the purchase, renovation, and development of real estate in Chicago.

15. **Jerome H. Cohen**, age 63, is a resident of Naples, Florida. Jerome Cohen founded Equitybuild and Equitybuild Finance. He is the CEO and President of Equitybuild. Along with his son Shaun, Jerome Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

16. **Shaun D. Cohen**, age 39, is a resident of New York, New York. He is the President and sole officer of Equitybuild Finance and the Vice President of Equitybuild. Along with his father, Shaun Cohen controlled Equitybuild and Equitybuild Finance, including controlling their operations, the content of the representations made to investors described herein, and transactions to and from their bank accounts.

## FACTS

17. Since 2010, Defendants Equitybuild, Equitybuild Finance, Jerome Cohen and Shaun Cohen (collectively, "Defendants") have raised at least $135 million by selling securities to more than 900 investors throughout the United States.

18. None of the securities or securities offerings described herein was registered with the SEC.

19. While the mechanics of the investments changed over time, Defendants offered and sold securities by promising to pool investor funds to purchase, renovate, or develop real estate properties, primarily in underdeveloped areas on the South Side of Chicago.

**Phase 1: The Private Mortgage Notes**

20.     By 2010, Defendants had begun offering and selling promissory notes (the "Notes") to investors.

21.     The parties to the Notes were:  (a) the "borrower," which was usually Equitybuild, and (b) the investors, each of which the Notes described as a "lender."

22.     The Notes provided for interest rates ranging from 12% to 20%, with investors receiving higher interest rates for investing greater amounts of money.

23.     The terms of the Notes ranged from six to 24 months.  At the end of the Notes' terms, Defendants offered investors the option of, instead of returning investors' principal, rolling over the principal into a new Note.  Many investors availed themselves of this option.

24.     Each Note referenced a specific real estate property, which investor funds would purportedly be pooled to purchase, renovate, and/or develop.  Each Note represented that the Note was secured by a fractional interest in a mortgage in the identified property.

25.     However, per the investment forms Defendants drafted, the investors assigned to Equitybuild Finance, as the "Collateral Agent," all of their rights and powers under the Notes and mortgages.  Defendants thus structured the mortgages to be typically entered between:  (a) Equitybuild, an affiliate entity, or, in some case, a third-party purchaser; and (b) the investors "care of" Equitybuild Finance.

26.     Jerome Cohen signed the Notes and mortgages on behalf of Equitybuild (or its affiliates).  Shaun Cohen, having been delegated the ability to do so by the investors, signed the Notes on behalf of Equitybuild Finance.

**Defendants Promoted the Notes as Profitable and Safe Investments Secured by Real Estate**

27.     Defendants utilized a variety of promotional methods to solicit investments in the Notes.  These included Equitybuild's website, emails to prospective investors, a call center and salespeople, in-person presentations, social media, and Google advertising.

28.     As part of their marketing efforts, Equitybuild and Equitybuild Finance also issued and distributed to investors promotional booklets referred to as "white papers."

29.     The salespeople Defendants used to solicit investors received commissions based on the amounts of investments they obtained.  These salespeople ultimately reported to Shaun Cohen, who instructed them to bring in at least $50,000 in new investments each day.

30.     Defendants' promotional materials touted the Notes as "low risk" investments that were secured by real estate.  For instance, in one white paper, Defendants described how "Equitybuild is ushering in a new era by making real estate investing more secure and reliable than ever."  The same white paper describes Equitybuild's "Three Guarantees," which included promises that Equitybuild would compensate investors for any deficiencies in the real estate's operating income and declines in property values.

31.     In another white paper, Equitybuild Finance assured investors that if the mortgage ever goes into default, investors could simply sell the property in a quick sale and get their money out of the investment.

32.      Defendants also sought to downplay the risk of investing by describing their purportedly successful track record.  Marketing emails frequently touted the fact that "EquityBuild has Never Defaulted on a Loan and has Zero Foreclosures," and had a "perfect payment track record."  Equitybuild's website and white papers similarly claimed that it was

able to achieve "Operational Mastery" due to a "proprietary econometric model" that successfully identifies undervalued properties.

33.     Defendants paired their assurances of low risk investments with the lure of "consistently" delivering "double-digit returns."  Defendants touted how their "investors receive impressive, double-digit returns that roll in month after month, regular as clockwork, but require absolutely no ongoing effort on their part."

34.     Defendants told investors that their double-digit returns would be generated through third-party purchasers, who would use the investor-funded mortgages to purchase the properties securing the Notes.  Defendants told investors that these third-party purchasers borrow on shorter terms and at higher rates than purchasers using traditional mortgages, allowing Equitybuild and Equitybuild Finance to generate "high returns that beat the stock market."

35.     Defendants told investors that Equitybuild and Equitybuild Finance earned their profits from the third party purchasers, but not from the investors.  To that end, Defendants told investors that Equitybuild and Equitybuild Finance retained as profits the difference between the mortgage payments received from the third party purchases and the interest payments made to the Note investors.

36.     Reinforcing the safety and profitability of the Notes, Defendants' marketing emails claimed that these third-party purchasers were "qualified" borrowers with "A-grade" credit.  Defendants also represented that the properties collateralizing investors' Notes would generate "more than enough revenue to cover the borrower's note payments as well as all of the property's operating expenses, and still return positive cash flow."

**In Reality, Defendants Charged the Note Investors Heavy Undisclosed Fees, Purchased Poorly Performing Real Estate, and Began Operating a Ponzi Scheme**

37.     Defendants' representations that they made money by keeping the difference between the mortgage payments of third-party purchasers and the Note investors' interest payments were false and misleading.  Contrary to these representations, and concealed from investors, Defendants kept 15% to 30% of the Note investors' investments as undisclosed fees.

38.     Defendants kept these fees hidden by telling investors that the properties securing their Notes were worth significantly more than the actual cost of the properties.  Specifically, the offering memoranda Defendants provided to Note investors listed a "purchase price" or "sale price" for each property that was inflated, on average, by more than 47%.  This meant Defendants collected far more money from investors than what they told investors was necessary to acquire the properties securing each Note.

39.     Jerome and Shaun Cohen used these secret fees to fund their personal living expenses, and to keep the scheme going by making Ponzi-style payments to earlier investors.

40.     The inflated purchase prices presented to investors also meant that the investments were far riskier than Defendants led investors to believe.  Indeed, the Notes were not, as Defendants claimed, "fully" or "100%" secured by real estate at the price disclosed to investors.  Rather, to the extent they were secured at all, the Notes were only secured by the actual, and much smaller, value of the properties.

41.     Beyond the undisclosed fees, Defendants deceived investors by falsely representing that the properties securing the Notes were profitable investments that generated positive cash flows.

42.    In reality, and unknown to investors, many of properties securing the Notes performed quite poorly, with monthly expenses far exceeding their revenues.  This meant that few, if any, of the properties generated enough revenues to fund the investors' interest payments.

43.    Despite Defendants' claims of successful real estate investments, Equitybuild's internal financial statements, which were not shared with investors, revealed a net loss for 2015 of $12 million.

44.    Contrary to Defendants' representations, investors' interest payments were not funded by third-party buyers' mortgage payments.  Rather than selling the properties to third-party purchasers, Equitybuild owned most of properties securing the Notes.  And by 2015, Defendants no longer even tried to find third-party buyers.

45.    With the properties failing to generate sufficient income, Defendants began operating the Notes offering as a Ponzi scheme, using new investor funds to pay earlier investors' interest payments.  From January 2015 through February 2017, investors received approximately $14.5 million in interest payments.  During that same period, the revenue earned from properties' rental income and third party buyers' monthly payments amounted to only $3.8 million. Defendants never told investors that they were relying on fresh investor funds, rather than income-producing properties, in order to finance the interest payments.

46.    Given the poor performance of many of their properties, Defendants' claim of having "zero foreclosures" was also misleading.  Indeed, even in the event of a default by the borrower, it would have been impossible for investors to foreclose.

47.    This is because, as part of the Note investments, investors delegated to Equitybuild Finance all of their powers under the Notes and mortgages, including the power to foreclose.  And, even absent that delegation, there was no practical way for investors to

foreclose, since there were multiple investors on each property and Defendants did not provide investors with the other investors' contact information.

48.     Similarly misleading were Defendants' representations that they had never defaulted on a loan.  Defendants routinely extended the payback terms on investors' Notes, often for years. Defendants forced investors to either agree to these extensions or be placed on a "buyout list" and wait for Defendants to find another investor willing to buy out the original investment.  As of June 2018, Defendants had approximately $3 million worth of investments on the buyout list.

49.     Defendants also forced approximately 100 investors to accept unsecured promissory notes in lieu of their original "secured" Notes.  Nevertheless, Defendants continued to offer securities to new investors without disclosing that previous investors had been compelled to extend their payback terms, been placed on the buyout list, or had their secured Notes switched to unsecured notes.

50.     And, despite touting Defendants' successful track record and "Operational Mastery," Defendants failed to disclose to investors that Jerome and Shaun Cohen had each previously filed for bankruptcy.

51.     Nor did Defendants actually employ an "econometric model" to select properties, as the offering materials represented.  Unbeknownst to investors, and as Jerome Cohen acknowledged to SEC investigators, the "econometric model" represented to investors was merely some "back of the envelope" calculations and selecting real estate was not a "core competency" of Defendants.

**Phase 2:  Defendants Begin Offering Investments in Real Estate Funds**

52.     In 2017, Jerome and Shaun Cohen began making changes to the business model they presented to investors.  But while the mechanics of the investments changed, the fraud continued.

53.     At that time, rather than offering promissory notes, they began offering investments in real estate "funds."  To date, Defendants have offered a total of over $70 million in investments in at least seven different funds.  Defendants told investors in these funds that Defendants would pool investor proceeds to purchase and renovate real estate, again primarily on the South Side of Chicago.

54.     With names like "Chicago Capital Fund," and "South Side Development Fund," Defendants continued to promise investors double-digit returns.  These fund offerings remain ongoing, with one fund offering 17% returns for 24 months, and another offering 14% returns in as short as six months.  One fund promises "guaranteed" returns.

55.     As was the case with the Notes, the funds' offering materials tout the profitably of the investment, while failing to disclose Defendants' poor performance record, precarious financial condition, and operation of a Ponzi scheme.

56.     For instance, Defendants failed to disclose to the fund investors that, rather than being deployed to purchase or renovate real estate, Defendants used significant portions of fund investor money to repay earlier Note investors.

57.     Defendants also concealed from investors that many of the properties that make up these new funds are the very same properties that purportedly secured prior investors' Notes. Without prior disclosure to the Note investors, Defendants transferred title of properties purportedly securing the Notes to special purpose entities owned by Jerome Cohen.

58.     While the funds' offering materials list the properties the funds intend to acquire, they fail to mention that the Defendants acquired those buildings in the course of the earlier Note offerings and that the properties supposedly served to secure the prior Note investments.

59.     While touting the profitability of the funds, the funds' offering materials also fail to disclose Defendants' inability to repay earlier investors.  According to Equitybuild's records,

as of late 2017, investors in more than 1,200 Notes had not been repaid their principal, totaling almost $75 million in delinquent payments. Defendants concealed this fact and also their inability to make earlier investors whole. Demonstrating the unlikelihood that Defendants can repay investors, as of May 31, 2018, Equitybuild and Equitybuild Finance had less than $100,000 in their bank accounts.

**The Fraud Continues: Even on the Brink of Collapse, Defendants Continue to Solicit Investors by Offering Outsized Returns and Hiding Their Severe Financial Problems**

60.     Defendants recently started coming clean about their failed investments and dire financial condition – but only to earlier investors and not to prospective investors from whom Defendants continue to solicit fresh investments.

61.     In May and June of 2018, Defendants disclosed to earlier investors that they were unable to continue making interest payments on the Notes and that they were in the process of unilaterally changing the terms of investors' investments.

62.     At that time, Shaun Cohen emailed prior investors that Equitybuild had accumulated a "debt load that is not sustainable" and that continuing to pay investor interest payments "would lead to an inevitable disaster that would put your investment at risk of significant loss." Shaun Cohen further wrote that Equitybuild had "no choice but to restructure and reduce the debt burden" by unilaterally converting investors' Notes or unsecured promissory notes to equity positions in one of the funds.

63.     In early August 2018, Equitybuild emailed a video recording of Shaun Cohen to Note investors. On the recording, Shaun Cohen: (a) states that Equitybuild's properties are "negatively cash flowing," (b) acknowledges that investor interest payments have stopped and that principal has not been returned, (c) discloses that Equitybuild had funded investor interest payments using "fee income" from later investors, but that fees charged to later investors could

12

no longer satisfy the interest payments to earlier investors, (d) warns investors not to file lawsuits against Equitybuild, (e) states that investors will not receive payments until Equitybuild's rental income exceeds its expenses, and (f) advises that Equitybuild was cutting staff down to a "skeleton crew" and would not be able to respond to investor inquiries.

64.     While making these stark admissions to earlier investors, Defendants provide no such warning to the unwitting investors to whom they currently offer fund securities. Instead, Defendants continue to raise new money, promising "guaranteed" returns and annual interest payments as high as 17% – all while hiding Defendants' severe financial problems and the fact that they told earlier investors they could no longer make their interest payments.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
### (Against All Defendants)

65.     Paragraphs 1 through 64 are realleged and incorporated by reference.

66.     As more fully described in paragraphs 1 through 64, Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and prospective purchasers of securities.

67.     As described in more detail in paragraphs 1 through 64 above Defendants each acted with scienter in that they knowingly or recklessly made the material misrepresentations and omissions and engaged in the fraudulent scheme identified above.

68.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

### COUNT II

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act
and Exchange Act Rule 10b-5(b)
(Against Defendants Jerome Cohen and Shaun Cohen)**

69.     Paragraphs 1 through 64 are realleged and incorporated by reference.

70.     Defendants Equitybuild and Equitybuild Finance, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

71.     Defendants Jerome Cohen and Shaun Cohen knowingly or recklessly provided substantial assistance to Defendants Equitybuild and Equitybuild Finance in the commission of these violations.

72.     Defendants Jerome Cohen, Shaun Cohen, Equitybuild and Equitybuild Finance acted with scienter and/or recklessly.

73.     By reason of the foregoing, Equitybuild and Equitybuild Finance violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Jerome Cohen and Shaun Cohen are liable for aiding and abetting those violations pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## COUNT III

### Control Person Liability Under Section 20(a) of the Exchange Act
### (Against Jerome Cohen and Shaun Cohen)

74.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

75.     Jerome Cohen and Shaun Cohen (a) directly or indirectly controlled Defendants Equitybuild and Equitybuild Finance, (b) possessed the power and ability to control Defendants Equitybuild and Equitybuild Finance as to their violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (c) were culpable participants in Defendants Equitybuild's and Equitybuild Finance's violations of the Exchange Act, including by knowingly or recklessly authorizing and causing Equitybuild and Equitybuild Finance to make the false and misleading representations and omissions described herein and use investor proceeds in the manner described herein.

76.     By reason of the foregoing, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Jerome Cohen and Shaun Cohen are jointly and severally liable with, and to the same extent as, Defendants Equitybuild and Equitybuild Finance for their violations of the Exchange Act as stated above in Count I.

## COUNT IV

### Violations of Section 17(a) of the Securities Act
### (Against All Defendants)

77.     Paragraphs 1 through 64 are realleged and incorporated by reference as though fully set forth herein.

78.     By engaging in the conduct described in paragraphs 1 through 64 above, Defendants, in the offer and sale of securities, by the use of the means and instruments of interstate commerce, directly or indirectly:

     a. employed devices, schemes and artifices to defraud;

     b. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     c. engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

79.     Defendants intentionally, recklessly, and negligently engaged in the conduct described above.

80.     By reason of the foregoing, Defendants violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## COUNT V

### Violations of Section 5(a) and 5(c) of the Securities Act
### (Against All Defendants)

81.     Paragraphs 1 through 64 above are realleged and incorporated herein by reference.

82.     By their conduct, Defendants directly or indirectly: (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the

16

mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

83.     By reason of the foregoing, Defendants have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

## RELIEF REQUESTED

**WHEREFORE,** the SEC respectfully requests that this Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the violations charged and alleged herein.

### II.

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder.

### III.

Issue an Order requiring Defendants, on a joint and several basis, to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, including prejudgment interest.

**IV.**

With regard to the Defendants' violative acts, practices and courses of business set forth herein, issue an Order imposing upon Defendants appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other relief as this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby requests a trial by jury.

Respectfully Submitted,

Dated: August 15, 2018

 /s/ Benjamin J. Hanauer
Benjamin J. Hanauer (hanauerb@sec.gov)
Ariella Guardi (guardia@sec.gov)
Timothy J. Stockwell (stockwellt@sec.gov)
175 West Jackson Blvd., Suite 1450
Chicago, IL 60604
Phone:  (312) 353-7390
Facsimile: (312) 353-7398
Attorneys for Plaintiff
U.S. Securities and Exchange Commission